James BOYD, Linwood Williams, Gene Boyd, Sandra Harris, Oscar Turner, Lori Gaston, Letitia Fennel Brown, Andre Shanks, William Bassett, Billy Graham, Christopher Crayton and James Cooper, individually and on behalf of all other similarly situated individuals, Plaintiffs,

v.

INTERSTATE BRANDS CORPORATION, d/b/a Wonder Bread, d/b/a Hostess, d/b/a Drakes, Defendants.

No. 00–CV–2249 (RRM)(RML).

United States District Court, E.D. New York.

March 4, 2009.

Deborah L. Marakowitz, Robert B. Stulberg, Broach & Stulberg, LLP, New York, NY, for Plaintiffs.

Brian Finucane, Fisher & Phillips LLP, Leonard Singer, Mark Stites, Von Hayes, Bioff, Singer & Finucane, L.L.P., Kansas City, MO, Jed L. Marcus, Bressler Amery & Ross P.C., Florham Park, NJ, for Defendants.

## MEMORANDUM & ORDER

MAUSKOPF, District Judge.

On February 5, 2009, United States Magistrate Judge Robert M. Levy issued a Report and Recommendation (Docket No. 156) (the "Report and Recommendation") recommending denial of plaintiffs' motion pursuant to Federal Rule of Civil Procedure 23 to certify a class of similarly situated individuals in this employment discrimination lawsuit against defendant Interstate Brands Corporation ("IBC"). No objections to the Report and Recommendation were filed by any party. Upon a review of the record, and for the reasons below, this Court concludes that there is no clear error on the face of the record, and adopts the Report and Recommendation in full. Plaintiffs' motion for class certification is therefore DENIED.

## DISCUSSION

### I. Standard of Review

When an objection is made to the magistrate judge's disposition of a dispositive motion, the "district judge must determine de novo any part of the ... disposition that has been properly objected to." Fed.R.Civ.P. 72(b)(3). However, when no objections have been made, this Court may adopt the report so long as it is not facially erroneous. *See* Fed.R.Civ.P. 72(b), advisory committee's note (citing *Campbell v. United States Dist. Court,* 501 F.2d 196, 206 (9th Cir.1974)); *see, e.g., Marrero v. Keane,* No. 93 Civ. 3573, 1995 U.S. Dist. LEXIS 1833, at *1–2, 1995 WL 66660, at *1 (S.D.N.Y. Feb. 16, 1995); *Nelson v. Smith,* 618 F.Supp. 1186, 1189–90 (S.D.N.Y.1985).

### II. Magistrate Judge Levy's Report and Recommendation Is Not Facially Erroneous

█ A party seeking class certification must satisfy all four elements of Rule 23(a) and at least one element of Rule 23(b). *Id.* at 355 (citing *McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 222 (2d Cir.2008)). Furthermore, a judge tasked with assessing a class certification motion must resolve any factual disputes that are relevant to the requirements of Rule 23, even when this requires examination of an overlapping merits issue. *Id.* at 356 (citing *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offerings Sec. Litig.),* 471 F.3d 24, 41 (2d Cir.2006)).

█ Following a thorough analysis of plaintiffs' contentions and the evidence submitted in support thereof, Magistrate Judge Levy found that plaintiffs failed to meet the requirement of Rule 23(a)(2) that they demonstrate the existence of questions of law or fact common to the class, and so recommended that their motion for class certification should be denied.[1] *Id.* at 356–58. In order to establish commonality, plaintiffs must show that "the challenged practice is *causally related* to a pattern of disparate treatment or has a disparate impact." *Id.* at 359–60 (quoting *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283 (2d Cir.1999)). Demonstrating such a causal relation requires plaintiffs to offer significant statistical proof that the alleged discrimination has had an effect on the class as a whole. *Id.* at 360 (citing *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 159 n. 15, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Caridad,* 191 F.3d at 292).

█ In evaluating the motion for class certification, Magistrate Judge Levy grouped plaintiffs' claims into two categories, (1) claims regarding subjective personnel policies and (2) claims regarding racial harassment, analyzing each separately. Regarding the first set of claims, the Magistrate Judge found that plaintiffs had put forth sufficient evidence to show that IBC's personnel policies were subjective, but had failed to offer statistical proof demonstrating a causal relation between the challenged policies and a pattern of disparate treatment or disparate impact. *Id.* at 360–63. Plaintiffs' proof consisted of expert reports from Dr. Mark F. Killingsworth, a professor of economics at Rutgers University, who analyzed data regarding promotions between 1996 and 2000. (*See* Declaration of Mark F. Killingsworth,

---

1. This Court recognizes the significant work done in this case by both Magistrate Judge Levy and counsel for the parties. In addition to reviewing the extensive briefing on plaintiffs' motion for class certification, the Magistrate Judge also held oral argument and allowed the parties to submit supplemental, post-argument briefing on issues raised during that argument. It is clear that this is a case in which all of the issues were thoroughly and vigorously aired.

dated Sept. 18, 2006 (attached as Ex. MM to Declaration of Robert B. Stulberg, dated June 19, 2007 (Docket No. 132)); Reply Declaration of Mark F. Killingsworth, dated Nov. 27, 2007 (attached as Ex. Q to Reply Declaration of Robert B. Stulberg, dated Nov. 27, 2007 (Docket No. 147)).) Defendants offered their own expert testimony from Dr. Donald R. Deere, consisting of both a critique of Dr. Killingsworth's methods and conclusions and a separate analysis of the promotions data concluding that there was no statistical evidence of race discrimination. (*See* Declaration of Donald R. Deere, dated Jan. 22, 2007 (attached as Ex. 3 to Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification Pursuant to Fed.R.Civ.P. 23 (Docket No. 136) ("Defs.' Mem.")); Supplemental Declaration of Donald R. Deere, dated Apr. 2, 2007 (attached as Ex. 4 to Defs.' Mem.); Second Supplemental Declaration of Donald R. Deere, dated Jan. 4, 2008 (attached as Ex. 1 to Defendants' Sur–Reply in Opposition to Plaintiffs' Motion for Class Certification Pursuant to Fed.R.Civ.P. 23 (Docket No. 152)); *see generally* Report and Recommendation at 353–55 (summarizing the statistical evidence).) Upon review of this evidence, the Magistrate Judge concluded that, even accepting plaintiffs' expert's opinions at face value:

> [P]laintiffs cannot get past the fact that Dr. Killingsworth did not find a statistically significant disparity in promotion rates between African–American and non-African-American employees at IBC. In other words, plaintiffs' statistics do not demonstrate common questions of fact because they do not tend to show that being African American has had a widespread effect on employees' promotions, demotions, or work assignments.

*Id.* at 361. Given that plaintiffs' own expert could not demonstrate statistically significant evidence of discrimination, this Court agrees with Magistrate Judge Levy's conclusions and finds that they are not facially erroneous.

Regarding plaintiffs' second set of claims, that the named class members' anecdotes of racially motivated harassment presented a common issue of law and fact for the entire class, the Magistrate Judge examined the evidence and found that plaintiffs had failed to demonstrate that the limited instances of harassment identified could support a finding that questions common to the class existed with respect to racially motivated harassment. *Id.* at 364–66. The incidents related by plaintiffs fail to establish an inference of class-wide impact, and courts evaluating similar claims have denied class certification. *See id.* at 365 (citing *Carlson v. C.H. Robinson Worldwide, Inc.,* No. 02–Civ–3780, 2005 WL 758602, at \*13 (D.Minn. Mar.31, 2005); *Faulk v. Home Oil Co.,* 184 F.R.D. 645, 659 (M.D.Ala.1999); *Levels v. Akzo Nobel Salt, Inc.,* 178 F.R.D. 171, 177 (N.D.Ohio 1998)). Furthermore, the Magistrate Judge had at an earlier point in this litigation (May 19, 2003) established a procedure whereby the plaintiffs could report racially offensive conduct, harassment, discrimination, or retaliation, yet no such incidents had been reported. *Id.* at 365–66. Accordingly, Magistrate Judge Levy's recommendation that certification of this second set of claims be denied is not facially erroneous.

Because the Magistrate Judge found that plaintiffs had failed to meet their burden of establishing commonality under Rule 23(a), it was unnecessary to analyze the remaining requirements of Rule 23. *Id.* at 366; *see also McLaughlin,* 522 F.3d at 222; *In re Zyprexa Prods. Liab. Litig.,* 253 F.R.D. 69, 191 (E.D.N.Y.2008) (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). Accordingly, the Magistrate Judge recommended that plaintiffs' motion for class certification be denied in its entirety. *Id.* at 366.

### CONCLUSION

Upon this Court's review of the record, Magistrate Judge Levy's unobjected to Report and Recommendation that plaintiffs' motion for class certification be denied is not facially erroneous. Accordingly, the said Report and Recommendation is hereby adopted in full. It is therefore ORDERED that Plaintiffs' motion for class certification is DENIED.[2]

SO ORDERED.

---

2. Plaintiffs' failure to file timely objections to the Magistrate Judge's Report and Recommendation serves as a waiver of their right to appeal this

## REPORT AND RECOMMENDATION

LEVY, United States Magistrate Judge.

Plaintiffs James Boyd, Linwood Williams, Gene Boyd, Sandra Harris, Oscar Turner, Letitia Fennel Brown, Andre Shanks, William Bassett, Billy Graham, Christopher Crayton, and James Cooper[1] (collectively, "named plaintiffs") move pursuant to Fed. R.Civ.P. 23 to certify a class of similarly situated individuals in this employment discrimination lawsuit against defendant Interstate Brands Corporation ("IBC" or "defendant"). By order dated February 3, 2003, the Honorable John Gleeson, United States District Judge, referred this motion to me for a Report and Recommendation. The case was reassigned to the Honorable Joseph F. Bianco on February 10, 2006, and to the Honorable Roslynn R. Mauskopf on December 27, 2007. The parties completed briefing on January 7, 2008, and I heard oral argument on January 15, 2008 (see Transcript of Oral Argument, dated Jan. 15, 2008 ("Tr.")). At the court's invitation, both sides submitted supplemental briefs on January 25, 2008. For the reasons stated below, I respectfully recommend that plaintiffs' motion be denied.

## BACKGROUND AND FACTS

The named plaintiffs are current and former employees of IBC.[2] (Fourth Amended Complaint, dated Dec. 11, 2000 ("Compl."), ¶ 1.) IBC is a national corporation that produces, distributes, and sells Wonder Bread, Hostess, and Drakes brand baked goods.[3] (Compl. ¶ 26; see also Deposition of James Forbes, dated Nov. 14 & 15, 2002 ("Forbes Dep."),[4] attached as Ex. S to the Declaration of Robert B. Stulberg, Esq., dated June 19, 2007 ("Stulberg Decl."), at 73.) The putative class consists of:

All African–American persons who have been employed by IBC at its Metro New York facilities during the period December 31, 1994 to the present, who have held and/or who have been eligible to hold managerial positions in distribution or sales, and who have been, continue to be and/or may be in the future adversely affected by IBC's discriminatory policies and practices.

(Compl. ¶ 28.)

### A. IBC's Organizational Structure

Defendant objects to the certification, essentially contending that because of the nature of IBC's organizational structure, the putative class members did not share a common workplace experience. In particular, defendant argues that the named and unnamed class members worked at geographically diffuse IBC locations and for different arms of the corporation with differing management structures. (See, e.g., Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification, filed Aug. 20,

---

Order. See 28 U.S.C. § 636(b)(1); Report and Recommendation at 366.

1. Plaintiffs originally included Lori Gaston as a named plaintiff, but she was voluntarily dismissed from this case on March 1, 2002. (See Notice of Voluntary Dismissal as to Plaintiff Lori Gaston, dated Feb. 25, 2002, so ordered on Mar. 1, 2002; see also Deposition of Andre Shanks, dated Dec. 20 & 21, 2001, Feb. 6, 2002, & June 13, 2002, attached as Ex. J to the Declaration of Robert B. Stulberg, Esq., dated June 19, 2007, at 180.)

2. Six of the named plaintiffs are currently employed at IBC. They are: James Boyd, Sandra Harris, Oscar Turner, Billy Graham, and Christopher Crayton. (Declaration of Sharon Corrente, dated Aug. 19, 2007 ("Corrente Decl."), attached as Ex. 1 to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification, filed Aug. 20, 2007 ("Def.'s Mem."), ¶ 11.) Nine of the named plaintiffs were actively employed at IBC when they filed or joined this suit.

3. IBC filed for bankruptcy protection in September 2004 and, as of August 2007, was still in the process of developing a reorganization plan. (See Def.'s Mem. at 37; Corrente Decl. ¶ 17.) The bankruptcy stay was lifted solely for the purpose of hearing and deciding plaintiffs' class certification motion. (Def.'s Mem. at 57.)

4. Although most of the depositions took place over multiple days, the page numbers are contiguous for each deponent. Therefore, I will treat each multi-day deposition as a single deposition. However, the parties submitted different pages of each deposition along with each of the four briefs. For ease of reference, I will distinguish between differently-marked exhibits. For instance, plaintiffs and defendant have both submitted different portions of the deposition of James Forbes—in the exhibits attached to plaintiffs' original motion and to defendant's sur-reply. When citing a deposition, I will note which party submitted the excerpts at issue.

2007 ("Def.'s Mem."), at 6–7.) Due to the nature of the parties' arguments, it is necessary to explain in some detail the workings of IBC relevant to plaintiffs' claims.

IBC's corporate headquarters is located in Kansas City, Missouri. (Compl. ¶ 26; Deposition of Gene Crawford, dated Nov. 12, 2002 ("Crawford Dep."), attached as Ex. X to the Stulberg Decl., at 41; Forbes Dep., attached as Ex. S to the Stulberg Decl., at 135–36.) In August 1998, IBC bought Continental Baking Company ("CBC"), which manufactured and distributed the Drakes cake product line.[5] (Deposition of Glenn J. Pape, dated Apr. 9, 2003 ("G. Pape Dep."), attached as Ex. T to the Stulberg Decl., at 144.) Thus, from January 1995 until August 1998, the putative class consists only of African–American individuals who were employed in the distribution or sale of Hostess and Wonder Bread products. (Plaintiffs' Memorandum of Law in Support of Motion for Class Certification, filed June 20, 2007 ("Pls.' Mem."), at 12.)

IBC divides its national operations among three regions—called East, Central, and West—which are each then split into north and south divisions. (Deposition of William Mackin, dated Mar. 26 & 27, 2003 ("Mackin Dep."), attached as Ex. P to the Stulberg Decl., at 12–13.) The Northeast division contains five production plants, known as bakeries, located in Jamaica, New York; Wayne, New Jersey; Buffalo, New York; Philadelphia, Pennsylvania; and Biddeford, Maine. (Id. at 11.) Each bakery acts as a production center and local hub within a division. (Deposition of David R. Russell, dated Mar. 5 & Apr. 7, 2003 ("Russell Dep."), attached as Ex. Y to the Stulberg Decl., at 58.) IBC's products are delivered from a bakery to satellite facilities known as "depots" or "branches," which store the trucks that distribute IBC products to retail establishments. (Id. at 73–74; see also Forbes Dep., attached as Ex. S to the Stulberg Decl., at 77.)

Plaintiffs allege that the "Metro New York" region, from which they intend to draw the putative class, consists of the Wayne, New Jersey ("Wayne") and Jamaica, New York ("Jamaica") bakeries and the twenty-eight depots assigned to those two bakeries. (Pls.' Mem. at 11–12.)[6] Defendant disputes the designation "Metro New York," arguing that plaintiffs are defining the class based on a "non-existent organizational structure." (Def.'s Mem. at 10.) Specifically, defendant argues that "Metro New York" or "Metro New York/New Jersey" are informal terms for the depots and bakeries near New York City and are not official units of IBC. (See id. at 10; Declaration of Sharon Corrente, dated Aug. 19, 2007 ("Corrente Decl."), attached as Ex. 1 to Def.'s Mem., ¶ 7.) Plaintiffs counter that defendant's management personnel and human resources documents refer to the Jamaica bakery and, after 1998, the Wayne bakery as together comprising an area called "Metro New York." (See Pls.' Deposition Exs. 14 & 15, attached as Ex. NN to the Stulberg Decl.; see also Forbes Dep., attached as Ex. S to the Stulberg Decl., at 70–71; Russell Dep., attached as Ex. Y to the Stulberg Decl., at 39–42; Deposition of Michael Crowe, dated Mar. 6, 2003 ("Crowe Dep."), attached as Ex. W to the Stulberg Decl., at 89.)

Before the acquisition of CBC in 1998, IBC managed its New York City operations from the Jamaica bakery. (Forbes Dep., attached as Ex. S to the Stulberg Decl., at 72.) From

---

5. Various named plaintiffs worked initially for CBC but became IBC employees when the two companies merged. For purposes of clarity, and because the corporate transition does not affect the outcome of this motion, I will refer to both companies as IBC when discussing a plaintiff's employment history.

6. The twenty-eight depots are: Albany Avenue, NY; Asbury Park, NJ; Bathgate, NY; Bohemia, NY; Conner Street, NY; Carlstadt, NJ; East Brunswick, NJ; Elmsford, NY; Fairfield, NJ; Farmingdale, NY; Garden City, NY; Greenpoint, NY; Hicksville, NY; Highland, NY; Irvington, NJ; Jamaica, NY; Long Island City, NY; Medford, NY; Middlesex, NJ; Middleton Street, NY; Montgomery, NY; Neptune, NJ; Ozone Park, NY; Roosevelt Avenue, NY; Saddlebrook, NJ; Wayne, NJ; Woodbridge, NJ; and Woodside, NJ. (Plaintiffs' Responses and Objections to Defendant's Fourth Interrogatories to Class Representative Plaintiffs ("Fourth Class Resp."), attached as Ex. JJ to the Stulberg Decl., at 4–5; see also Pls.' Mem. at 11–12; Plaintiffs' Deposition Exs. 14, 15, 16 & 17, attached as Ex. NN to the Stulberg Decl.) The Neptune and Asbury Park depots were transferred to the control of IBC's Philadelphia, PA bakery in January 1999. (Forbes Dep., attached as Ex. S to the Stulberg Decl., at 50.)

the acquisition of CBC in August 1998 until April 1999, the distribution and sales of the Drakes brand was managed from the Wayne bakery, while the Hostess and Wonder brands remained organized out of the Jamaica bakery. (G. Pape Dep., attached as Ex. T to the Stulberg Decl., at 24–25; Forbes Dep., attached as Ex. S to the Stulberg Decl., at 39–41.) In April 1999, IBC restructured the production, distribution, and sales of its brands—essentially consolidating both of the "cake" brands' products in the Wayne bakery and leaving all the "bread" products at Jamaica. (G. Pape Dep., attached as Ex. T to the Stulberg Decl., at 57–59.) In May 2003, IBC again reorganized the distribution and sales of its brands in the New York region, transferring the sales organization for the Hostess and Drakes brands to the Jamaica bakery. (Russell Dep., attached as Ex. Y to the Stulberg Decl., at 95–96; Plaintiffs' Deposition Ex. 28, attached as Ex. NN to the Stulberg Decl.) This means that, until May 2003, there were three separate sales forces, each with separate management: (1) distribution and sales of Wonder products out of the Jamaica Bakery, (2) distribution and sales of Hostess products out of the Wayne Bakery, and (3) distribution and sales of Drakes products out of the Wayne Bakery.[7] (G. Pape Dep., attached as Ex. 25 to Def.'s Mem., at 86–88; Williams Dep., attached as Ex. 17 to Def.'s Mem., at 386; Russell Decl., attached as Ex. 2 to Def.'s Mem., ¶ 5.) Since the May 2003 reorganization, none of the putative class members have reported to depots under management of the Wayne Bakery. (Tr. at 53.)

The personnel structure of IBC is as follows: a General Manager is the highest-level employee at each bakery. (Deposition of Michael Colgan, dated Mar. 27, 2003 ("Colgan Dep."), attached as Ex. Q to the Stulberg Decl., at 27; *see also* Crawford Dep., attached as Ex. X to the Stulberg Decl., at 45.) Directly below the General Manager, General Sales Managers oversee a bakery's sales and distribution operations. (Crawford Dep., attached as Ex. X to the Stulberg Decl., at 44–45.) Area Sales Managers are in charge of the sales and distribution for a number of depots. (*Id.*) Lead Sales Supervisors, or "Lead Supervisors," oversee the sales and distribution for one particular depot.[8] (*Id.* at 43–44.) Below the Lead Supervisor, Sales Supervisors oversee a number of sales routes and distribution personnel within a particular depot. (*Id.* at 43.) Route Sales Representatives report to depots and deliver IBC products to wholesale customers, such as grocery stores and delicatessens. (Russell Dep., attached as Ex. Y to the Stulberg Decl., at 73–74.) When Route Sales Representatives are sick or on vacation, Route Riders temporarily replace them. (Deposition of Robert Mauro, dated Apr. 24, 2003 ("Mauro Dep."), attached as Ex. V to the Stulberg Decl., at 108–13.) Sales Supervisors occasionally will run routes for absent Route Sales Representatives when there are not enough Route Riders to cover all routes. (*See, e.g., id.* at 308–10.)

**B. Employment Histories of the Named Plaintiffs**

Plaintiffs contend that each named plaintiff's trajectory through the ranks of IBC management was hindered or slowed due to the alleged racial discrimination in defendants' personnel policies and practices. (Pls.' Mem. at 14–18.) It is thus useful to describe each named plaintiff's history at IBC.

*1. James Boyd*

Plaintiff James Boyd began working as a Route Sales Representative at IBC's Middleton Street depot in 1975. (Deposition of James Boyd, dated Dec. 6 & 7, 2001, June 19, 2002, & Oct. 10, 2006 ("J. Boyd Dep."), attached as Ex. D to the Stulberg Decl., at 18, 21; Compl. ¶ 48.) IBC promoted him to

---

**7.** Depots under the management of the Jamaica and Wayne bakeries generally distributed only one brand of IBC products, although there were a number of depots that distributed multiple brands. (*See* G. Pape Dep., attached as Ex. T to the Stulberg Decl., at 74; Crawford Dep., attached as Ex. X to the Stulberg Decl., at 22–24; Forbes Dep., attached as Ex. S to the Stulberg Decl., at 74–84.)

**8.** Some depots have a Branch Manager in addition to a Lead Supervisor. (*See* Russell Dep., attached as Ex. Y to the Stulberg Decl., at 80–82.) Between approximately 1995 and 1998, all depots had a Branch Manager. (Deposition of Robert Mauro, dated Apr. 24, 2003 ("Mauro Dep."), attached as Ex. V to the Stulberg Decl., at 97–98.) Before 1995, Branch Managers were known as District Sales Managers. (*Id.*)

Sales Supervisor at the Garden City depot in 1987 and to Branch Manager at the Middleton depot in 1989. (J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 87–88; Compl. ¶¶ 49–50.) Plaintiffs allege that IBC unjustifiably demoted James Boyd from Branch Manager to Lead Supervisor in 1997 when the Middleton Street depot closed and merged in part with the Greenpoint depot. (Plaintiffs' Responses and Objections to Defendant's First Interrogatories to James Boyd, Sandra Harris, Oscar Turner, Lori Gaston, Letitia Fennel Brown, Andre Shanks, William Bassett, and Billy Graham ("Pls.' First Resp."), attached as Ex. Z to the Stulberg Decl., at 37–38; *see also* Deposition of James Boyd, dated Dec. 6 & 7, 2001, June 19, 2002, & Oct. 10, 2006 ("J. Boyd Reply Dep."), attached as Ex. A to the Reply Declaration of Robert Stulberg, dated Nov. 27, 2007 ("Stulberg Reply Decl."), at 692–93 (explaining why James Boyd felt that the transfer was a demotion). *But see* Mackin Dep., attached as Ex. P to the Stulberg Decl., at 20 (claiming that designations "Branch Manager" and "Lead Supervisor" are interchangeable).)

IBC placed James Boyd in the Woodside depot in 1998. (Pls.' First Resp. at 24.) In 1999, IBC demoted him to Sales Supervisor at the Greenpoint depot. (*Id.* at 38; J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 20–21.) In December 2000 or January 2001, he was promoted to Lead Supervisor at the Greenpoint depot. (J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 21.) At some point in 2003, white IBC managers transferred him to the Bathgate branch on a difficult assignment, which he perceived as a demotion and "harassment." (*Id.* at 677.) In July 2004, IBC selected James Boyd to be the District Sales Manager for Long Island, where he remained at least until his last deposition, which took place on October 10, 2006. (*Id.* at 662–65.) However, he did not consider that placement a "promotion," because he felt that "[i]t only brought [him] to a level that [he] should have had years ago," but for delays due to several racially motivated demotions. (*Id.* at 665; *see also* Pls.' First Resp. at 37–38.)

*Andre Shanks*

Plaintiff Andre Shanks ("Shanks") began working at IBC as a Route Sales Represen-

tative in March 1994. (Deposition of Andre Shanks, dated Dec. 20 & 21, 2001, Feb. 6 & Apr. 26, 2002 ("Shanks Dep."), attached as Ex. J to the Stulberg Decl., at 9.) In January 1996, he was promoted to Sales Supervisor. (*Id.* at 121–22.) In April 1999, IBC demoted Shanks back to Route Sales Representative and transferred him to Ozone Park. (Pls.' First Resp. at 39.) IBC promoted him to Sales Supervisor again in September 2001. (Shanks Dep., attached as Ex. J to the Stulberg Decl., at 12, 281–82.) Shanks has worked primarily in the Woodside, South Ozone Park, and Greenpoint depots. (*Id.* at 12, 284.) During his deposition, Shanks stated that he felt that he has been passed over in promotion decisions because of his race. (*Id.* at 174–80.) According to plaintiffs' Memorandum of Law, Shanks resigned from IBC on July 6, 2006. (Pls.' Mem. at 15; *see also* Corrente Decl. ¶ 11.)

*Gene Boyd*

Plaintiff Gene Boyd worked at IBC from September 1967 until November 1998. (Compl. ¶ 81.) IBC promoted him from Route Sales Representative to Sales Supervisor in 1983. (*Id.* ¶ 84; Deposition of Gene Boyd, dated Feb. 19 & 20, May 9, June 11 & 12, 2002 ("G. Boyd Sur–Reply Dep."), attached as Ex. 5 to Defendant's Sur–Reply in Opposition to Plaintiffs' Motion for Class Certification, filed Jan. 7, 2008 ("Def.'s Sur-Reply"), at 14.) Gene Boyd worked at a number of depots during his employment, primarily Jamaica and South Ozone Park. (Compl. ¶¶ 84, 86; *see also* Deposition of Gene Boyd, dated Feb. 19 & 20, May 9, June 11 & 12, 2002 ("G. Boyd Reply Dep."), attached as Ex. C to the Stulberg Reply Decl., at 102–03.) In 1998, IBC management transferred Gene Boyd to the Greenpoint depot, which he considered a racially motivated demotion. (*See* G. Boyd Reply Dep., attached as Ex. C to the Stulberg Reply Decl., at 80; Plaintiffs' Responses and Objections to Defendant's First Interrogatories to Gene Boyd and Linwood Williams, dated Feb. 12, 2001 ("Williams Resp."), attached as Ex. CC to the Stulberg Decl., at 13.) In part because of this transfer, Gene Boyd resigned in November 1998. (*See* Deposition of Gene Boyd, dated Feb. 19 & 20, May 9, June 11 & 12, 2002 ("G. Boyd Dep."), attached as Ex. F to

the Stulberg Decl., at 159.) Plaintiffs allege that IBC constructively discharged Gene Boyd by subjecting him to a racially hostile work environment and by failing to promote him in accord with his experience and capabilities. (Pls.'s Mem. at 17; Compl. ¶¶ 80–88; *see also* G. Boyd Dep., attached as Ex. F to the Stulberg Decl., at 827, 853.)

*Linwood Williams*

Plaintiff Linwood Williams ("Williams") worked at IBC from 1972 until 1997. (Deposition of Linwood Williams, dated Dec. 13 & 14, 2001 & Jan. 31, 2002 ("Williams Dep."), attached as Ex. E to the Stulberg Decl., at 62, 476.) Williams worked at the South Ozone Park, Woodside, Middleton Street, Greenpoint, and Hicksville depots. (Compl. ¶¶ 64–67.) IBC promoted him to Sales Supervisor in 1983. He stopped working at CBC sometime in 1988, but returned as a Sales Supervisor in 1990. (Williams Dep., attached as Ex. E to the Stulberg Decl., at 49–51, 483.) IBC promoted Williams to Branch Manager of the Greenpoint depot in 1993. (*Id.* at 79, 106.) However, in February 1996, Williams was transferred from Greenpoint to Woodside, and soon thereafter, IBC managers demoted him from Branch Manager to Lead Supervisor and transferred him to the Hicksville depot. (*Id.* at 91, 460.) In September 1997, IBC again demoted Williams, this time from Lead Supervisor to Sales Supervisor. (Compl. ¶ 76; Williams Dep., attached as Ex. E to the Stulberg Decl., at 376.) Williams states that he resigned in December 1997, based in part on the demotions and in part on racial harassment in the workplace. (Compl. ¶ 79; Williams Dep., attached as Ex. E to the Stulberg Decl., at 376.) Plaintiffs allege that Williams's experience at IBC amounted to a constructive discharge. (Pls.' Mem. at 17.)

*Sandra Harris*

Plaintiff Sandra Harris ("Harris") began working at IBC in 1987 as a Route Sales Representative at the Middleton Street depot. (Deposition of Sandra Harris, dated Dec. 18, 2001 & Feb. 5, 2002 ("Harris Dep."), attached as Ex. G to the Stulberg Decl., at 10.) She has worked at the Middleton Street, Woodside, and Greenpoint depots. (Compl. ¶ 92.) IBC managers transferred her to the Greenpoint depot in late 1997 or early 1998, and she was promoted from Route Sales Representative to Sales Supervisor at the Greenpoint depot in July 2001. (Deposition of Sandra Harris, dated Dec. 18, 2001 & Feb. 5, 2002 ("Harris Reply Dep."), attached as Ex. D to the Stulberg Reply Decl., at 23.) Harris claims that because of her race, she was not promoted to a level commensurate with her experience and qualifications. (*See* Harris Dep., attached as Ex. G to the Stulberg Decl., at 507–08.) She remains employed at IBC. (Corrente Decl. ¶ 11.)

*Oscar Turner*

Plaintiff Oscar Turner ("Turner") began working at IBC as a Route Sales Representative on January 9, 1995 and continues to work in that capacity. (Deposition of Oscar Turner, dated Jan. 18 & June 13, 2002 ("Turner Dep."), attached as Ex. H to the Stulberg Decl., at 7, 34; Corrente Decl. ¶ 11.) He has worked at the Woodside and Greenpoint depots. (Turner Dep., attached as Ex. H to the Stulberg Decl., at 34, 37.) Turner claims that IBC managers passed him over for less-qualified white workers in promotion decisions and that a racially hostile work environment discouraged him from applying for management positions. (*Id.* at 316–18, 422.)

*Letitia Brown*

Plaintiff Letitia Brown ("Brown") began working at IBC in 1982. (Deposition of Letitia Fennel Brown, dated Feb. 1, 2002 ("Brown Dep."), attached as Ex. I to the Stulberg Decl., at 16.) [9] Throughout her employment with IBC, she remained a non-managerial Route Sales Representative and worked at the Middleton, Woodside, Hicksville, and Farmingdale depots. (Compl. ¶ 114.) Although she was interested in a promotion, she believes that she was passed over because of her race. As she stated in her deposition, "every supervisor that was newly hired since I've been with the company has been white and I was never offered a position with the company, never,

---

9. Brown's deposition transcript contains two sets of page numbers. I will refer to the numbers that appear at the bottom center of the page.

never." (Deposition of Letitia Fennel Brown, dated Feb. 1, 2002, ("Brown Reply Dep."), attached as Ex. F to the Stulberg Reply Decl., at 278.) Brown "voluntarily resigned" from IBC in October 2003. (Corrente Decl. ¶ 10.)

*William Bassett*

Plaintiff William Bassett ("Bassett") began working for IBC in July 1995. (Deposition of William Bassett, dated Jan. 30 & June 13, 2002 ("Bassett Dep."), attached as Ex. K to the Stulberg Decl., at 14.) He has worked at the South Ozone Park, Albany Ave., and Greenpoint depots. (*Id.* at 15–17.) He has never been promoted beyond Route Sales Representative. (*Id.* at 17; Compl. ¶ 130.) However, he believes that less-qualified white employees were promoted over him because of his race. (Bassett Dep., attached as Ex. K to the Stulberg Decl., at 363–65.)

*Billy Graham*

Plaintiff Billy Graham ("Graham") has worked at IBC as a Route Sales Representative from 1998 until the present. (Deposition of Billy Graham, dated Jan. 16, Mar. 21, & Apr. 23, 2002 ("Graham Dep."), attached as Ex. L to the Stulberg Decl., at 9, 16; Corrente Decl. ¶ 11.) He has worked at the Hicksville, Woodside, and Greenpoint depots. (Compl.¶ 137.) He testified in his deposition that he felt discouraged from expressing interest in a supervisor position because of the racially hostile work environment and because he did not know that any such positions were open. (Graham Dep., attached as Ex. L to the Stulberg Decl., at 225–26.)

*Christopher Crayton*

Plaintiff Christopher Crayton ("Crayton") has worked at IBC since 1995. (Deposition of Christopher Crayton, dated Feb. 21 & Mar. 21, 2002 ("Crayton Dep."), attached as Ex. M to the Stulberg Decl., at 3–4.) As of his February 2002 deposition, Crayton had stopped working at IBC due to a work-related injury; however, it appears that he

remained at IBC as of August 2007. (*Id.* at 32; Corrente Decl. ¶ 11.) Crayton worked as a Route Sales Representative in the Greenpoint depot. (Crayton Dep., attached as Ex. M to the Stulberg Decl., at 35–37; Compl. ¶ 144.) He stated in interrogatories and in his deposition that he believed that less-qualified white IBC employees were promoted over him because of his race. (*See* Plaintiffs' Responses and Objections to Defendant's First Interrogatories to Christopher Crayton and James Cooper ("Cooper Resp."), attached as Ex. DD to the Stulberg Decl., at 10–11; Deposition of Christopher Crayton, dated Feb. 21 & Mar. 21, 2002, ("Crayton Reply Dep."), attached as Ex. J to the Stulberg Reply Decl., at 163–67.)

*James Cooper*

Plaintiff James Cooper ("Cooper") worked at IBC from 1984 until 1986 and again from 1988 until October 2003. (Deposition of James Cooper, dated Jan. 17 & Apr 23, 2002 ("Cooper Dep."), attached as Ex. N to the Stulberg Decl., at 13, 68; Corrente Decl. ¶ 10.) He worked primarily in the Saddleback and Woodbridge depots as a Route Sales Representative. (Cooper Dep., attached as Ex. N to the Stulberg Decl., at 68; Compl. ¶ 150.) He also believes that less-qualified white workers were promoted before him because of his race. (*See* Cooper Resp. at 11–12; *see also* Deposition of James Cooper, dated Jan. 17 & Apr 23, 2002 ("Cooper Reply Dep."), attached as Ex. K to the Stulberg Reply Decl., at 212.)

**C. Anecdotal Evidence of Racially Motivated Harassment at IBC**

Plaintiffs' causes of action [10] are divisible into two groups: (1) racially motivated harassment and (2) racially motivated personnel decisions, including promotions, demotions, and work assignments. First, plaintiffs claim that IBC subjected the class to a

---

**10.** The complaint lists the following eight causes of action: (1) race discrimination in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1981; (2) unlawful retaliation in violation of the Civil Rights Act of 1871, *id.;* (3) race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* (4) unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, *id.;* (5) race discrimination in

violation of New York Executive Law § 296; (6) unlawful retaliation in violation of New York Executive Law § 296; (7) race discrimination in violation of New York City Administrative Code § 8–107; and (8) unlawful retaliation in violation of New York City Administrative Code § 8–107 (Compl.¶¶ 153–235.) The four retaliation claims do not involve the unnamed class members.

"racially hostile and demeaning work environment." (Compl.¶ 157(a); *see also* Compl. ¶¶ 178(a), 199(a), 220(a).) All of the named plaintiffs contend that white supervisors and coworkers frequently subjected them to racially motivated verbal harassment in the workplace. (*See, e.g.*, J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 22–24; Shanks Dep., attached as Ex. J to the Stulberg Decl., at 40–44; G. Boyd Dep., attached as Ex. F to the Stulberg Decl., at 568, 577; Williams Dep., attached as Ex. E to the Stulberg Decl., at 455; Harris Dep., attached as Ex. G to the Stulberg Decl., at 162–64; Turner Dep., attached as Ex. H to the Stulberg Decl., at 71–72, 174–75; Brown Dep., attached as Ex. I to the Stulberg Decl., at 106; Bassett Dep., attached as Ex. K to the Stulberg Decl., at 235–37; Graham Dep., attached as Ex. L to the Stulberg Decl., at 173; Crayton Dep., attached as Ex. M to the Stulberg Decl., at 28, 441; Cooper Dep., attached as Ex. N to the Stulberg Decl., at 103.) Examples of the alleged harassment include white managers and employees mocking or mimicking "the speech patterns of African Americans" (Pls.' Mem. at 20; *see, e.g.*, Harris Dep., attached as Ex. G to the Stulberg Decl., at 189–90) and making racially demeaning jokes (*see, e.g.*, G. Boyd Dep., attached as Ex. F to the Stulberg Decl., at 585–85), derogatory references to neighborhoods that are predominantly African–American (*see, e.g.*, Williams Dep., attached as Ex. E to the Stulberg Decl., at 451 (stating that it was "common" for managers to refer to African–American neighborhoods as a "zoo" or "jungle"); *see also* Graham Dep., attached as Ex. L to the Stulberg Decl., at 180–81, J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 26), and other insensitive and derogatory comments (*see, e.g.*, Harris Dep., attached as Ex. G to the Stulberg Decl., at 152–56 (testifying that supervisors called African–American–owned stores "dirty and disgusting"); J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 22 (testifying that a supervisor suggested to James Boyd that he could "collect money" by pulling his ski hat down over his face and committing robbery); Harris Dep., attached as Ex. G to the Stul-

berg Decl., at 192–93 (testifying that a supervisor suggested that a named plaintiff's "brothers" must have stolen her new car for her)). The named plaintiffs further allege that white supervisors and coworkers directed various racial epithets, such as "nigger," "coon," and "buckwheat," at them or other putative class members in the workplace. (*See, e.g.*, Shanks Dep., attached as Ex. J to the Stulberg Decl., at 49–50; Brown Dep., attached as Ex. I to the Stulberg Decl., at 274–75; Turner Dep., attached as Ex. H to the Stulberg Decl., at 174, 382.)

Several named plaintiffs also contend that the white management at IBC was unresponsive and dismissive when African–American employees complained about racially motivated harassment. (*See, e.g.*, Compl. ¶ 38(b); J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 117, 135; Williams Resp. at 6; Shanks Dep., attached as Ex. J to the Stulberg Decl., at 142.) One such incident took place in 1997, when Richie Selva ("Selva"), a white IBC employee, allegedly called Linwood Williams's home several times on two different evenings and shouted racial epithets at the people who answered the telephone. (Williams Resp. at 4–5; Williams Dep., attached as Ex. E to the Stulberg Decl., at 321–22.) Williams, Selva's supervisor at the time, alleges that IBC's upper management did not respond adequately when Williams complained of Selva's actions. (*Id.; see also* Williams Dep., attached as Ex. E to the Stulberg Decl., at 96–97, 158–60, 321–22.) Williams eventually obtained an order of protection against Selva.[11] (*See* Order of Protection, dated Sept. 17, 1998, attached as Ex. M to the Stulberg Reply Decl.)

Many of the named plaintiffs' allegations regarding racially demeaning statements or harassment involve a few particular supervisors in the Woodside and Greenpoint depots. For example, six named plaintiffs describe acts of racial harassment by a supervisor named Bob Longo ("Longo"). (*See, e.g.*, J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 90; Williams Dep., attached as Ex. E to the Stulberg Decl., at 197; Harris Dep., attached as Ex. G to the Stulberg Decl., at 161–64; Turner Dep., attached as Ex. H to

---

11. Selva is no longer employed at IBC. (*See* J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 75.) According to defendant, Williams filed a police report, and Selva ultimately pleaded guilty to criminal harassment. (Def.'s Mem. at 14 n. 6.)

the Stulberg Decl., at 162–64, 445; Graham Dep., attached as Ex. L to the Stulberg Decl., at 112–13, 597–603; Crayton Dep., attached as Ex. M to the Stulberg Decl., at 210–15.) Longo held various positions at IBC, including Branch Manager for Cake at the Hicksville Depot (Williams Dep., attached as Ex. E to the Stulberg Decl., at 198), "Manager" at the Bathgate depot (J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 92), and Lead Supervisor at the Greenpoint depot (*see* Pls.' First Resp. at 5). In November 2000, David Russell, the Human Resources Manager at the Wayne Bakery, issued Longo a formal warning about his insensitive remarks. (*See* Letter from David Russell to Bob Longo, dated Nov. 22, 2000, attached as Ex. A to the Declaration of David Russell, dated Aug. 20, 2007 ("Russell Decl."), attached as Ex. 2 to Def.'s Mem.) Apparently, Longo did not heed the warning, and on July 23, 2001, IBC terminated him because of his "unacceptable behavior."[12] (Letter from David Russell to Bob Longo, dated July 23, 2001, attached as Ex. B to the Russell Decl.)

Other managers who figure prominently in the named plaintiffs' anecdotal claims of racial harassment are Mike Realmutto ("Realmutto"), Branch Manager at the Woodside depot, and Bob Dieterich ("Dieterich"), an Area Sales Manager at the Greenpoint depot. (*See, e.g.,* J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 25 (testifying that Realmutto mimicked the speech of African Americans); Williams Dep., attached as Ex. E to the Stulberg Decl., at 108 (testifying that Realmutto used the words "jungle" and "zoo" to describe African–American neighborhoods); Crayton Dep., attached as Ex. M to the Stulberg Decl., at 29–34 (testifying that Realmutto called James Boyd "Jim

Boy"); Williams Dep., attached as Ex. E to the Stulberg Decl., at 114 (testifying that Dieterich referred to African–American neighborhoods as "zoos"); Turner Dep., attached as Ex. H to the Stulberg Decl., at 174 (testifying that Dieterich used the term "coon"); Shanks Dep., attached as Ex. J to the Stulberg Decl., at 144 (testifying that Dieterich called white neighborhoods "God's country").) Others who allegedly made or tolerated racially offensive comments were General Manager James Forbes, General Sales Managers Robert Mauro and Tom Kaszuba, Area Sales Managers Al Perreca,[13] Robert Israel, Michael Smith, and Frank Moran, Regional Sales Director Richard Ainsworth, and Lead Supervisors Barry Proudman and Jerry Asaro. (*See* Plaintiffs' Supplemental Memorandum of Law in Support of Motion for Class Certification, dated Jan. 25, 2008 ("Pls.' Supp. Mem."), at 3 (citing deposition transcripts and interrogatory responses); Pls.' Reply Memorandum of Law in Support of Motion for Class Certification Pursuant to Fed.R.Civ.P. 23, filed Nov. 28, 2007 ("Pls.' Reply Mem."), at 8; G. Boyd Dep., attached as Ex. F to the Stulberg Decl., at 813–14.)

Defendant argues that plaintiffs' description of racially motivated harassment is, in truth, "limited to allegations regarding a small number of named plaintiffs and a handful of depots" and that "the vast majority of the putative class [members] were never touched by any of the alleged racially offensive conduct." (Def.'s Mem. at 49.)

### D. Allegations of Racially Motivated Promotion Policies

Plaintiffs' second group of claims centers around allegations that defendant's "disparate personnel policies and practices …

---

**12.** None of the named plaintiffs made a direct complaint to IBC under the company's EEO policy regarding Longo's conduct, or any other racially offensive workplace conduct. (*See* Def.'s Mem. at 57–58; Fourth Class Resp., attached as Ex. JJ to the Stulberg Decl., at 9, 16–18.) However, the named plaintiffs do present evidence of a few complaints to supervisors. (*See* Pls.' Reply Memorandum of Law in Support of Motion for Class Certification Pursuant to Fed.R.Civ.P. 23, filed Nov. 28, 2007, at 33–35.)

**13.** Named plaintiff Linwood Williams testified in his deposition that Perreca "allowed the harass-

ment" of Williams by Selva and "allowed" another employee "to be insubordinate without any redress." (Williams Dep., attached as Ex. E to the Stulberg Decl., at 87–90.) Williams did not testify that Perreca personally made any racially offensive jokes or comments. Likewise, named plaintiff Gene Boyd testified that Kaszuba and Israel were present when Forbes used the term "jungle route." (G. Boyd Reply Dep., attached as Ex. C to the Stulberg Reply Decl., at 679.) He did not accuse Kaszuba or Israel of using racially-offensive language themselves.

have denied African–Americans opportunity for advancement to and within the ranks of management." (Pls.' Mem. at 2; *see also* Compl. ¶¶ 157(b)-(k), 178(b)-(k), 199(b)-(k), 220(b)-(k).) Specifically, plaintiffs claim that IBC's managers

> discouraged non-managerial African–American employees from seeking and obtaining managerial positions, ... refused to promote non-managerial African–American employees to managerial positions, preferring instead to promote less senior, less experienced Caucasian individuals to managerial positions, and ... rapidly advanced Caucasian managerial employees while allowing [IBC's] few African–American managers to languish at, or be demoted to, the lowest levels of management.

(Pls.' Mem. at 4–5.) Plaintiffs argue that, because IBC's promotions policy was unwritten and subjective, it was prone to use in a discriminatory manner by the allegedly racist individuals in control of promotions. (Pls.' Mem. at 24–25.) Plaintiffs present two types of evidence to support these claims: anecdotal and statistical.

### 1. Anecdotal Evidence of Discrimination in Promotions

Plaintiffs' anecdotal evidence consists of the experiences of the named plaintiffs, recorded in their depositions and interrogatory responses. The named plaintiffs first allege that they experienced racially motivated discrimination when IBC promoted a number of less-qualified or less-experienced white employees before them. (*See, e.g.,* Pls.' First Resp. at 23–37.) Second, the named plaintiffs allege that IBC's managers assigned African–American employees to particular branches or routes in a discriminatory manner. (*See, e.g.,* Shanks Dep., attached as Ex. J to the Stulberg Decl., at 290; G. Boyd Dep., attached as Ex. F to the Stulberg Decl., at 160; Williams Dep., attached as Ex. E to the Stulberg Decl., at 82.) Third, several named plaintiffs testified that they did not receive the same encouragement to apply for managerial positions as white coworkers and that they were not "mentored" to the same extent as white coworkers. (*See, e.g.,* Deposition of Linwood Williams, dated Dec. 13 & 14, 2001 & Jan. 31, 2002 ("Williams Reply Dep."), attached as Ex. B to Stulberg Reply Decl., at 568; Pls.' First Resp. at 46–49.)

Finally, several named plaintiffs testified in their depositions that the management's failure to make supervisor-level openings known to lower-level IBC employees precluded African Americans from applying to these positions. (*See* G. Boyd Dep., attached as Ex. F to the Stulberg Decl., at 827; Harris Dep., attached as Ex. G to the Stulberg Decl., at 476–77; J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 226–27; Crayton Dep., attached as Ex. M to the Stulberg Decl., at 435; Cooper Dep., attached as Ex. N to the Stulberg Decl., at 204–05; Turner Dep., attached as Ex. H to the Stulberg Decl., at 314; Brown Dep., attached as Ex. I to the Stulberg Decl., at 277.) IBC acknowledges that it did not have a policy of posting managerial job openings until sometime in 2000 or 2002—depending on the bakery. (*See* Mackin Dep., attached as Ex. P to the Stulberg Decl., at 35 (stating that the policy of posting management-level job postings commenced in June 2002); Forbes Dep., attached as Ex. S to the Stulberg Decl., at 141–42 (stating that the posting policy began sometime in late spring 2002). *But see* G. Pape Dep., attached as Ex. T to the Stulberg Decl., at 104–05 (stating that IBC in Wayne began posting managerial jobs sometime in spring 2000); Crawford Dep., attached as Ex. X to the Stulberg Decl., at 50 (job listings were posted publicly beginning in 2000); *see also* Management/Supervisor Position Posting Procedures, dated Aug. 2002, attached as Ex. B to the Corrente Decl.) James Forbes, General Manager of the Jamaica Bakery, stated in his deposition that IBC developed the posting policy in response to the instant lawsuit, which plaintiffs filed in April 2000. (Forbes Dep., attached as Ex. S to the Stulberg Decl., at 147.) Furthermore, until well after the filing of this lawsuit, the managerial positions at the bakery level did not carry written hiring policies or even job descriptions specifying the duties and prerequisites for each managerial position. (*See* Deposition of John Wiltrakis, dated May 16, 2003 ("Wiltrakis Dep."), attached as Ex. O to the Stulberg Decl., at 27–28; Forbes Dep., attached as Ex. S to the Stulberg Decl., at 138; Colgan Dep., attached as Ex. Q to the Stulberg Decl., at 37.)

Defendant has admitted, "for purposes of this class certification motion[,] that [it] maintained a subjective promotion policy." (Def.'s Sur–Reply in Opposition to Pls.' Motion for Class Certification Pursuant to Fed. R.Civ.P. 23, filed Jan. 7, 2008 ("Def.'s Sur–Reply Mem."), at 5; *see also* Wiltrakis Dep., attached as Ex. O to the Stulberg Decl., at 100–02; Mauro Dep., attached as Ex. V to the Stulberg Decl., at 142–49.) Indeed, during the relevant years, the company maintained no written policies, procedures or objective criteria for promotions, demotions, supervisory work assignments, or supervisory training and support, instead giving managers unfettered discretion to make decisions regarding promotions, demotions, and branch assignments, and requiring no documentation or review of those decisions. (*See* Wiltrakis Dep., attached as Ex. O to the Stulberg Decl., at 101–02, 167; Mackin Dep., attached as Ex. P to the Stulberg Decl., at 31, 34, 46, 89–90; Crawford Dep., attached as Ex. X to the Stulberg Decl., at 102–04, 116–17, 138–39; Mauro Dep., attached as Ex. V to the Stulberg Decl., at 182–83, 274–75, 308; Forbes Dep., attached as Ex. S to the Stulberg Decl., at 268–70.) For instance, in describing the process of promoting a Route Sales Representative to a Sales Supervisor, the lowest managerial position, the human resources manager for the Wonder Bread product line stated: "Sales management would identify route sales representatives who they thought were promotable, and approach them in terms of their interest in becoming supervisors. Alternatively, the route sales rep. would probably make inquiries on his own as to the prospect of being or becoming a supervisor." (Crawford Dep., attached as Ex. X to the Stulberg Decl., at 51; *see also* Mauro Dep., attached as Ex. V to

the Stulberg Decl., at 146–56 (general sales manager describing his own subjective promotion process).) Decisions to promote individuals to positions higher than Sales Supervisor were similarly subjective and informal. (*See* Forbes Dep., attached as Ex. S to the Stulberg Decl., at 127–29; G. Pape Dep., attached as Ex. T to the Stulberg Decl., at 113; Crawford Dep., attached as Ex. X to the Stulberg Decl., at 84–85.)

### 2. Statistical Evidence of Discrimination in Promotions

The named plaintiffs present the declaration of an expert, economist Mark F. Killingsworth ("Killingsworth"), as statistical evidence of discriminatory promotion policies and practices. (*See* Declaration of Mark F. Killingsworth, sworn to Sept. 18, 2006 ("Killingsworth Decl."), attached as Ex. MM to the Stulberg Decl.) Dr. Killingsworth is a professor of economics at Rutgers University in New Jersey. (*Id.* ¶ 1.) Defendant provided Dr. Killingsworth with IBC's personnel data for the years 1995–2005 in the "Metro New York" region. (*Id.* ¶ 4.) However, Dr. Killingsworth states in his declaration that the data contained "widespread anomalies, gaps and problems." (*Id.* ¶ 5.) He decided that the errors precluded a proper analysis and worked with plaintiffs' counsel to repair the gaps. (*Id.* ¶ 6.) He states in his declaration that he is "satisfied that the [law firm's] work fills in and corrects a substantial portion of the data problems." (*Id.*) He further states that, even with these corrections, the data were distorted, incomplete, or inaccurate regarding promotions in 1995 and after 2000, and that he thus disregarded the years 1995 and 2000–2005.[14] (*Id.* ¶ 7.)

Dr. Killingsworth's conclusions[15] are as follows: between 1996 and 2000 (the "data

---

14. For example, according to Dr. Killingsworth, large numbers of employees are missing from IBC's data for one or more years in which they were employed from 1995 forward. (*See* Killingsworth Decl. ¶ 5.) In addition, IBC did not disclose job title information for employees hired before 1995. (*See* Deposition of Mark R. Killingsworth, Ph.D., dated Dec. 18, 2006, attached as Ex. R to the Stulberg Reply Decl., at 117.)

15. In his report, Dr. Killingsworth devotes substantial attention to an "assignment at hire" study (Tables 1 through 4 of his report), finding that from 1996 to 2000, no African Americans

were hired directly into low-level management positions, and only one African American was hired directly into an upper-level management position. (Killingsworth Decl. ¶ 10.) He concludes that, with respect to the initial job assignments of new hires, the "racial difference in the distribution of hires by job title category is statistically significant at the 0.0169 probability level." (*Id.* ¶ 11.) According to Dr. Killingsworth, this means that "a racial disparity at least as great as the one shown here would be observed solely as a result of chance less than two times in 100." (*Id.*) As defendant points out, plaintiffs do not assert a hiring claim in this case. Dr. Killings-

period"),[16] "out of 1027 non-African-Americans who were originally Route Sales Representatives ..., a total of 27 (or 2.63 percent) became Route Sales Managers. In contrast, none of the 140 African Americans ... became Route Sales Managers."[17] (*Id.* ¶ 15.) He found that this disparity was "within 0.02 of being statistically significant," meaning that "the probability of observing such a difference as a result of chance alone is slightly more than five in 100." (*Id.*) Put another way, Dr. Killingsworth found that there were 3.09 fewer promotions of African–American Route Sales Representatives than would be expected during the period of his analysis. (Killingsworth Dep., attached as Ex. 6 to Def.'s Mem., at 213–14.) With respect to promotions from low-level management to upper-level management,[18] Dr. Killingsworth found that, although no African Americans were hired as Route Sales Managers during the data period, there were already four African–American Route Sales Managers at IBC in 1995, and none advanced to higher level management by 2000. (Killingsworth Decl. ¶¶ 17–18.) On the other hand, of the 38 non-African-American Route Sales Managers employed in 1995, one had moved to an upper-level management position. (*Id.* ¶ 18.) Dr. Killingsworth states that, with respect to these promotions, "[t]he numbers are too small for a full-dress statistical analysis." (*Id.*) In his deposition, Dr. Killingsworth conceded that the data on upper-level promotions "provide no evidence of any race discrimination." (Killingsworth Dep., attached as Ex. 6 to Def.'s Mem., at 67–68.)

Defendant retained the expert services of economist Donald R. Deere ("Deere"), who conducted a statistical analysis of the personnel data for the years 1995–2005. (*See* Declaration of Donald R. Deere, sworn to Jan. 27, 2007 ("Deere Decl."), attached as Ex. 3 to Def.'s Mem.) Dr. Deere is an Associate Professor of Economics at Texas A & M University and a Senior Consultant for Welch Consulting, a firm that provides expert services in economics and statistics. (*Id.* ¶ 4.) In sum, Dr. Deere concluded that: (1) Dr. Killingsworth's analysis of promotions and assignment at hire "provides no basis for concluding there is a statistically significant difference disadvantageous to African–Americans at IBC"; (2) Dr. Killingsworth's analysis was "flawed and incomplete"; and (3) IBC's promotions showed no statistical evidence of race discrimination, and, in fact, "African–American Route Sales Representatives at IBC were promoted to route sales supervisor positions during 1995–2005 at a rate greater than would have been expected." (*Id.* ¶ 3.) Dr. Deere's report lists several aspects of Dr. Killingsworth's analysis with which he takes issue. (*Id.* ¶ 7.) For instance, Dr. Deere claims that Dr. Killingsworth neglected to include two promotions of African Americans during the data period, erroneously included 146 individuals not employed in the "Metro New York" region, failed to include over 300 individuals employed at the Wayne bakery in Route Sales Representative positions, and miscounted 700 employees as eligible for a promotion when, in fact, they were not eligible. (*Id.*)

Plaintiffs submitted a supplemental declaration by Dr. Killingsworth with their reply brief. (*See* Reply Declaration of Mark R. Killingsworth, sworn to Nov. 27, 2007 ("Killingsworth Reply Decl."), attached as Ex. Q to Stulberg Reply Decl.) In it, Dr. Killingsworth states that the discrepancies between his own and Dr. Deere's analyses were attributable to Dr. Deere's failure to calculate the total number of Route Sales Representatives accurately due to flaws in IBC's personnel data. (*Id.* ¶¶ 9, 15.) Furthermore, Dr. Killingsworth

---

worth's conclusions regarding the hiring data are therefore not relevant.

16. Dr. Killingsworth states that he did not use 1995 in this analysis because IBC organized the data annually and did not produce 1994 data, leaving him with no way to ascertain who had been promoted in 1995. (*See* Killingsworth Decl. ¶ 15.)

17. IBC promoted one African–American employee from Route Sales Representative in August 2000, approximately four months after the filing of this lawsuit. (*See* Reply Declaration of Mark R. Killingsworth, sworn to Nov. 27, 2007, attached as Ex. Q to the Stulberg Reply Decl., ¶ 21.)

18. By "low-level management," Dr. Killingsworth means "Route Sales Managers"—that is, those in the position of Sales Supervisor. (Killingsworth Decl. ¶ 9.) By "upper-level management," he means all managerial positions above Sales Supervisor. (*Id.*)

notes that Dr. Deere includes 1995 in his analysis, although the data for that year, according to Dr. Killingsworth, were rife with irregularities and problems. (*Id.*) Dr. Killingsworth opines that Dr. Deere's data "suffer from sizeable and serious omissions." (*Id.* ¶ 15.) Nevertheless, Dr. Killingsworth performed a statistical analysis of Dr. Deere's version of the internal promotion data,[19] including the August 2000 promotion of an African American, but without using the data from 1995. (*Id.* ¶ 22.) He found a difference in promotion rates within 1.43 standard deviations. This finding, he acknowledges, "would not be judged statistically significant at conventional test levels." (*Id.*) He further concludes that, without the 2000 promotion, the racial difference in promotions rises to 1.70 standard deviations, which is "within 0.040 of the threshold of 0.050 for statistical significance at conventional test levels." (*Id.* ¶ 22.) This latter finding contrasts with his analysis, using the data he analyzed in his original report, which found a difference in promotion rates within 1.91 standard deviations, "i.e . . . . within 0.0062 of the threshold for statistical significance at conventional test levels." (*Id.* ¶ 23.)

Dr. Deere also submitted a second supplemental declaration, in which he refutes Dr. Killingsworth's statements regarding Dr. Deere's use of the data. (Second Supplemental Declaration of Donald R. Deere, ("Deere 2d Supp. Decl."), attached as Ex. 1 to Def.'s Sur–Reply Mem.)

## DISCUSSION

■ It is well established that a party seeking class certification must satisfy all four elements of Rule 23(a) and at least one element of Rule 23(b). Fed.R.Civ.P. 23; *see McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir.2008). Rule 23(a) states:

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b) states:

(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

---

19. One further difference between Dr. Deere's and Dr. Killingsworth's data stems from Dr. Deere's use of a slightly larger definition for the "New York Metro Region." (*See* Killingsworth Reply Decl. ¶ 19 & n. 7.)

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

As the parties seeking certification, "plaintiffs bear the burden of proving that all of the Rule 23 requirements are met." *In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69, 191 (E.D.N.Y.2008) (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). In addition to the analysis under Rules 23(a) and (b), a court must determine whether the plaintiffs have shown, pursuant to the "implicit requirement" of Rule 23, that the class is ascertainable,[20] and that the representative plaintiffs are members of that class. *Bakalar v. Vavra,* 237 F.R.D. 59, 64 (S.D.N.Y.2006); *Petrolito v. Arrow Fin. Srvs., LLC,* 221 F.R.D. 303, 307 (D.Conn.2004) (citing *Norman v. Conn. State Bd. of Parole,* 458 F.2d 497 (2d Cir.1972)).[21]

" 'Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility.' " *Marisol v. Giuliani,* 126 F.3d 372, 377 (2d Cir.1997) (quoting *Sharif v. N.Y. State Educ. Dep't,* 127 F.R.D. 84, 87 (S.D.N.Y.1989)). At the same time, the court must perform a "rigorous analysis" to ensure that the plaintiffs have satisfied Rule 23's prerequisites. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

In this case, the parties' submissions contain numerous factual disputes. While a court assessing a class certification motion should not reach the ultimate merits of the case, *see Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), it must resolve any factual disputes that are relevant to a particular Rule 23

requirement. Recently, the Second Circuit clarified the law defining the applicable evidentiary standard in these disputes, holding that:

(1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*Miles v. Merrill Lynch & Co. (In re Initial Pub. Offerings Sec. Litig.),* 471 F.3d 24, 41 (2d Cir.2006) [hereinafter *In re IPO* ].

The court in *In re IPO* explained that "the district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met" and must "assess all of the relevant evidence admitted at the class certification stage," whether or not that assessment also bears on the merits of the case. *Id.* at

---

**20.** A class of African–American employees is *per se* ascertainable. *See Harris v. Initial Sec., Inc.,* No. 05 Civ. 3873, 2007 WL 703868, at *3 (S.D.N.Y. Mar. 7, 2007) ("Simply put, some groups, particularly those deemed to be distinguishable from others by immutable characteristics, such as African–Americans ... are so clearly accepted as objectively identifiable that no extended analysis is needed.") (quoting *Farber v. City of Paterson,* 440 F.3d 131, 137 (3d Cir. 2006)).

**21.** As one author recently explained, these requirements ensure that "when a judge 'certifies' a class—when he permits a plaintiff to represent other people—he certifies that he has satisfied himself that the plaintiff can so fully present the claims of other people that there is no need to give them a chance to speak for themselves." David G. Karro, *Common Sense About Common Claims,* 25 Hofstra Lab. & Emp. L.J. 33, 34 (2007). In other words, the court must consider the due process rights of the non-named class members, who may be bound by the results the class representatives obtain. *Id.* at 34–36.

41, 42. In doing so, the court is to apply a preponderance-of-the-evidence standard. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir.2008).[22]

With these principles in mind, I will address each Rule 23 requirement in turn.

## A. Rule 23(a)

### 1. *Numerosity*

█ Under Rule 23(a)(1), plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). This requirement serves to "promote judicial economy by avoiding a multiplicity of actions." *Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 238 F.R.D. 82, 93 (S.D.N.Y.2006) (citing *Robidoux v. Celani*, 987 F.2d 931, 935–36 (2d Cir.1993)). However, "[i]mpracticable does not mean impossible." *Robidoux*, 987 F.2d at 935. In assessing the practicality of joinder, the court should take several factors into account, including "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Id.* at 936. "Determination of practicability depends on all the circumstances surrounding a case, not on mere numbers." *Id.* (citing *Demarco v. Edens*, 390 F.2d 836, 845 (2d Cir.1968)).

The Second Circuit has stated that "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995). Plaintiffs may "rely on reasonable inferences drawn from the available facts in order to estimate the size of the class," *In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999); the court does not require "evidence of exact class size or identity of class members" to satisfy the numerosity requirement, *Robidoux*, 987 F.2d at 935.

Plaintiffs allege that their proposed class will be approximately 140 people, consisting of former and current African–American employees of IBC's sales and distribution workforce in the twenty-eight depots that make up the Metro New York region. (Pls.' Mem. at 18.)[23] Defendant argues that plaintiffs cannot satisfy the numerosity requirement because they are merely drawing a class based on "race and employment dates." (Def.'s Mem. at 22.) Defendant also contends that plaintiffs are required to submit evidence that "any alleged promotion discrimination or alleged racial harassment affected ... [the] 140 putative class members." (*Id.*) For this proposition IBC cites a footnote in *Falcon* that states: "[t]he mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer." 457 U.S. at 159 n. 15, 102 S.Ct. 2364. In essence, defendant argues that the actual number of class members who can allege to have suffered discrimination in promotion decisions is much smaller than 140, though it does not venture a guess as to how small the number may be. Defendant also argues that plaintiffs cannot meet the numerosity requirement because they have not named all of the purported class members. (*Id.* at 21–22, 102 S.Ct. 2364.) Finally, defendant argues that it would better serve judicial economy for the

---

**22.** The prior rule, as set forth in *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999), seemed to deny the district court the authority to make any factual determinations with respect to Rule 23 requirements. *See id.* at 291–93 (holding that a plaintiff must make "some showing" that Rule 23 requirements have been met, and condemning "statistical dueling" at the class certification stage). In addition, in *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 134–35 (2d Cir.2001), the Second Circuit stated that a court could certify a class as long as the plaintiffs' factual showing was "not fatally flawed." In the course of setting forth the

new standards described above, *In re IPO* overturned both of these precedents in no uncertain terms. *See In re IPO*, 471 F.3d at 40.

**23.** Plaintiffs' complaint estimated that the class would consist of 75 African–American IBC employees. (Compl.¶ 29.) However, during the discovery conducted for the current motion, plaintiffs discovered employment records that showed that the putative class constitutes 140 persons. (Killingsworth Decl. ¶ 15.) The increase appears to be due in large part to plaintiffs' seven-year delay in seeking class certification.

interested putative class members to join with the named plaintiffs. (*Id.* at 25–26, 102 S.Ct. 2364.)

Defendant's first two arguments are easily rejected. IBC has misconstrued the statement in *Falcon;* the sentence quoted in defendant's brief is preceded by the following: "[I]t is noteworthy that Title VII prohibits discriminatory employment *practices,* not an abstract policy of discrimination." 457 U.S. at 159 n. 15, 102 S.Ct. 2364. In other words, a plaintiff cannot maintain a class action alleging discrimination where he or she does not specify which particular employer actions constituted discrimination. Here, although the class most certainly would be race-based, the plaintiffs have cured the *Falcon* problem by describing in great detail defendant's subjective promotion practices and the anecdotes of racial animus in the workplace. As for defendant's claim that plaintiffs must name each class member, that argument is not supported by the law. *See Robidoux,* 987 F.2d at 935. Plaintiffs have estimated the class size based on computerized data that defendant disclosed during the course of discovery. (*See* Pls.' Reply Mem. at 37; Killingsworth Decl. at 11 (Table 4).) Furthermore, plaintiffs have identified 59 potential class members by name in an interrogatory. (*See* Plaintiffs' Responses and Objections to Defendant's Second Interrogatories to Class Representative Plaintiffs, dated Dec. 6, 2001 ("Second Class Resp."), attached as Ex. HH to the Stulberg Decl., at 5–6.)

The question of whether joinder of the putative class members would be more economical is somewhat more complex. Defendant may be correct that "[t]he geographical dispersion of depots is not so wide as to make it difficult for individual putative class members to join the case" and that "[c]lass members do not lack the financial resources to render joinder impracticable." (Def.'s Mem. at 25.) The class members are not as geographically dispersed as in some other class certification cases, *see, e.g., Marcera v. Chinlund,* 91 F.R.D. 579, 583 (W.D.N.Y.1981) (finding joinder impracticable where class was dispersed over the entire state of New York), and defendant has presented evidence that these employees earn over $50,000 per year. (*See* Corrente Decl. ¶¶ 14–15.) *See also LeGrand v. New York City Transit*

*Auth.,* No. 95–CV–0333, 1999 WL 342286, at *5 (E.D.N.Y. May 26, 1999) (finding that employees earning $47,318 per year earned "enough for the Court to reasonably infer that each has the ability to retain an attorney either to join in the pending action or to file a separate suit").

However, "determination of practicability depends on all the circumstances surrounding a case, not on mere numbers." *Robidoux,* 987 F.2d at 936. The first factor set forth in *Robidoux,* that is, "judicial economy arising from the avoidance of a multiplicity of actions," outweighs the other factors. 987 F.2d at 936. To hold 140 individual race-discrimination trials would certainly be a great deal less efficient than consolidation into a single action. *See id.* Defendant has not presented any evidence that plaintiffs' estimate of 140 class members is inaccurate. In addition, the final *Robidoux* factor, "requests for prospective injunctive relief which would involve future class members," is present here. 987 F.2d at 936. (*See* Compl. Prayer for Relief; *see also* Pls.' Mem. at 49.) Defendant's ultimate argument—that each of the claims of the named and putative class members "involve[s] highly individualized issues" (Def.'s Mem. at 25)—is better addressed in the commonality section, *infra.* In short, plaintiffs have demonstrated through undisputed evidence that they satisfy the numerosity requirement.

### 2. *Commonality and Typicality of the Putative Class Members' Claims*

Most of defendant's arguments against certification are centered on Rule 23's commonality and typicality elements. "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact," *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.,* 504 F.3d 229, 245 (2d Cir.2007), and "[e]ven a single common legal or factual question will suffice," *In re SCOR Holding (Switzerland) AG Litig.,* 537 F.Supp.2d 556, 571 (S.D.N.Y.2008) (citing *In re Agent Orange Prod. Liab.,* 818 F.2d 145, 166–67 (2d Cir.1987)). The proposed class members' claims are typical of those of the class when "each class member's claim

arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Cent. States,* 504 F.3d at 245 (citation omitted). Courts have noted that the commonality and typicality requirements "tend to merge" because "both serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence." *Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364. Here, defendant does not make any particularized typicality arguments; rather, it merges them with the commonality arguments. (*See* Def.'s Mem. at 26.) This Report and Recommendation will do the same.

▮ Under Rule 23(a)(2), plaintiffs must demonstrate that there are questions of law or fact common to the class. *Robinson v. Metro–North Commuter R.R.,* 267 F.3d 147, 155 (2d Cir.2001). This requirement, unlike the predominance requirement of Rule 23(b)(3), does not mandate that these issues overshadow potential individual issues, but only that common questions do exist. *See Moore v. PaineWebber, Inc.,* 306 F.3d 1247 (2d Cir.2002). Commonality "does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment." *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. 144, 153 (S.D.N.Y.2002) (citation and internal quotation marks omitted); *see also In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 145, 166–67 (2d Cir.1987); *Freeland v. AT & T Corp.,* 238 F.R.D. 130, 140 (S.D.N.Y.2006); *DeMarco v. Nat'l Collector's Mint, Inc.,* 229 F.R.D. 73, 80 (S.D.N.Y. 2005); *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 198–99 (S.D.N.Y.1992).

Plaintiffs have asserted the following common questions of law and fact: (1) whether IBC "has maintained and fostered a racially hostile work environment in violation of federal, state and local civil rights laws," (2) whether IBC "has engaged in a policy, pattern and practice of racial discrimination with respect to promotions and other personnel actions affecting career advancement," (3) whether "defendant's policies have had a disparate, adverse impact on African–American employees," (4) whether IBC "has treated African–American employees less favorably than it has treated comparable and/or less qualified Caucasian employees with respect to managerial promotion and other personnel actions affecting career advancement," (5) whether "defendant's actions and omissions at issue have occurred as a result of malice or reckless indifference to plaintiffs' statutorily protected civil rights," and (6) whether IBC's "racially discriminatory policies and practices should be enjoined." (Pls.' Mem. at 51–52.) As to each of these questions, plaintiffs contend, each class member's case will revolve around the same statistical and anecdotal evidence, deposition testimony, and documents. (*Id.* at 53.)

▮ In discrimination cases, "commonality does not mandate that all class members make identical claims and arguments, but requires that 'the gravamen of the [c]omplaint is that defendants discriminated against class members in the same general fashion.'" *Attenborough,* 238 F.R.D. at 94 (quoting *Open Hous. Ctr., Inc. v. Samson Mgmt. Corp.,* 152 F.R.D. 472, 476 (S.D.N.Y.1993)). Commonality in discrimination cases may be proved even where, as here, the decisions as to promotions and work assignments are geographically and organizationally diffuse. *See, e.g., Caridad,* 191 F.3d at 291–92 (overruled on other grounds by *In re IPO* ); *see also Dukes v. Wal–Mart, Inc.,* 509 F.3d 1168 (9th Cir.2007) (upholding certification in sex-discrimination case including claims of failure to promote where class consisted of 1.5 million employees located throughout all fifty states). The commonality requirement does not ask plaintiffs to prove that the discrimination actually did affect the class as a whole; such an inquiry is relegated to the merits phase of the case. *See Hnot v. Willis Grp. Holdings Ltd.,* 241 F.R.D. 204, 211 (S.D.N.Y.2007) [hereinafter *Hnot II* ] ("Commonality requires that plaintiffs present common *questions* of fact or law; plaintiffs' ultimate success at trial on the merits requires an *answer* to that question, specifically that defendants actually did discriminate against plaintiffs.") (emphasis in original).

▮ However, to establish commonality plaintiffs must show that "the challenged

practice is *causally related* to a pattern of disparate treatment or has a disparate impact." *Caridad,* 191 F.3d at 292 (emphasis added). "Causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994–95, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), *cited in Hnot v. Willis Grp. Holdings Ltd.,* 228 F.R.D. 476, 483 (S.D.N.Y.2005) [hereinafter *Hnot I* ]. Where, as here, plaintiffs are complaining of an overly subjective promotion policy that has been tainted by racial animus, the Second Circuit has noted that "proving that the grant of discretionary authority to supervisory employees either results in a pattern and practice of discrimination or affects one class of employees more harshly than others is likely to be extremely difficult," though not impossible. *Caridad,* 191 F.3d at 291.

In order to show commonality, courts require significant statistical proof that the alleged discrimination has had an effect on the class as a whole. See *Falcon,* 457 U.S. at 159 n. 15, 102 S.Ct. 2364 (*"Significant* proof that an employer operated under a general policy of discrimination conceivably could justify a class ... if the discrimination manifested itself ... in the same general fashion, such as through entirely subjective decision-making processes." (emphasis added)), *cited by Caridad,* 191 F.3d at 292; *see also Caridad,* 191 F.3d at 292 ("Where the decision-making process is difficult to review because of the role of subjective assessment, significant statistical disparities are relevant to determining whether the challenged employment practice has a class-wide impact."); *Harris v. Initial Sec., Inc.,* No. 05 Civ. 3873, 2007 WL 703868, at *4 n. 7 (S.D.N.Y. Mar. 7, 2007) (explaining that in discrimination cases "courts typically find commonality when the plaintiffs provide evidence demonstrating that being a member of a protected class has

a statistically significant effect on the employment practice at issue." (citing cases)). In presenting statistical evidence, plaintiffs' expert must "control[ ] for various factors that one would expect to be relevant" to promotion and compensation. *Caridad,* 191 F.3d at 293; *see also Hnot I,* 228 F.R.D. at 483.

I will address plaintiffs' commonality arguments in two sections, corresponding to their two groups of discrimination claims:

(a) *Commonality of Claims Regarding Subjective Personnel Policies*

Plaintiffs have provided sufficient evidence to show, and defendant does not dispute, that until some years after the filing of this lawsuit, IBC's promotion policy was unwritten, lacked job postings for managerial positions, and was heavily reliant on subjective and informal decision-making. (Def.'s Sur–Reply Mem. at 5; *see also* Wiltrakis Dep., attached as Ex. O to the Stulberg Decl., at 100–02; Mauro Dep., attached as Ex. V to the Stulberg Decl., at 142–49.) As indicated above, however, plaintiffs must show more than a subjective policy; they must also put forth statistics to demonstrate "that the challenged practice is causally related to a pattern of disparate treatment or has a disparate impact" on the putative class members. *Caridad,* 191 F.3d at 292.

Here, plaintiffs submit the report of Dr. Killingsworth to show supposed disparities in the promotion rates of African–American and non-African-American IBC employees. As explained, Dr. Killingsworth concludes that, with respect to promotions from Route Sales Representative to Route Sales Manager for the years 1996 to 2000 in the area plaintiffs have identified as "Metro New York," the disparity between African Americans and others was "within 0.02 of being statistically significant" at conventional test levels. (Killingsworth Decl. ¶ 15.) In other words, the disparity was almost, but not quite, statistically significant.[24] In his second analysis,

---

24. In his deposition, Dr. Killingsworth explained that "as a matter of the conventions of economic science, anything below a standard deviation of 1.96 is not statistically significant." (Killingsworth Dep., attached as Ex. 6 to Def.'s Mem., at 217–19.) Here, having analyzed African-American promotions for the 1996–2000 period, Dr.

Killingsworth found 1.9411 standard deviations. (Killingsworth Decl., Table 5.) He further testified as follows:

Q. Now, your conclusion with respect to Tables 5 and 6 is that there was not a significantly—a significant statistical difference between

including the August 2000 promotion of an African American but not the data from 1995, Dr. Killingsworth found a difference in promotion rates within 1.43 standard deviations which, he concedes, "would not be judged statistically significant at conventional test levels." (Killingsworth Reply Decl. ¶ 22.)

Defendant describes Dr. Killingsworth's reports as "flawed" and "riddled with major errors." (Def.'s Mem. at 28.) According to defendant, Dr. Killingsworth's reports and testimony are inaccurate because, *inter alia*, his analysis omitted a number of relevant promotions of African–American employees, failed to include over 300 individuals who became employees of IBC when it acquired Drakes in 1998, and mistakenly included over 100 employees who worked outside the purported "Metro New York" area. (*See* Def.'s Mem. at 27–29; Def.'s Sur–Reply Mem. at 6–9.) Further, defendant has presented its own expert testimony that there were more promotions among African Americans than one would expect under the circumstances. Plaintiffs steadfastly cling to the argument that Dr. Killingsworth's declaration and deposition show a significant disparity in treatment. (*See* Pls.' Reply Mem. at 22–31; 42–45.) However, even taking Dr. Killingsworth's opinions at face value and disregarding defendant's criticisms, plaintiffs cannot get past the fact that Dr. Killingsworth did not find a statistically significant disparity in promotion rates between African–American and non-African-American employees at IBC. In other words, plaintiffs' statistics do not demonstrate common questions of fact because they do not tend to show that being African American has had a widespread effect on employees' promotions, demotions, or work assignments. Absent a showing of significant statistical disparity, I cannot recommend that the court certify the class as to these claims.

One might question whether, before *In re IPO*, a court would have certified plaintiffs' class, as the court in *Caridad* instructed district courts not to engage in "statistical dueling" at the class certification phase. 191 F.3d at 292; *see also Hnot I*, 228 F.R.D. at 484 (pre-*In re IPO* case finding commonality, notwithstanding defendant's criticisms of plaintiff's expert's regression analyses, on the ground that, "at the class certification stage, only a plausible position needs to be set forth"). However, the Second Circuit overruled *Caridad* on this point when it stated that a court should "resolve" factual disputes and should certify a class only once it is "persuaded" that the Rule 23 requirements are met. *In re IPO*, 471 F.3d at 41. In *Hnot II*, the court held that this new standard did not mean that a court should "determine which of the parties' expert reports is more persuasive." 241 F.R.D. at 210. Rather, "an accurate statement of the law is that 'statistical dueling' is not relevant to the certification stage unless such dueling presents 'a valid basis for denying class certification.'" *Id.* (quoting *In re IPO*, 471 F.3d at 35.) Plaintiffs rely heavily on *Hnot II*, arguing in essence that *In re IPO* does not require a final resolution of statistics at the certification stage.

However, even if plaintiffs are correct, the court must still find—as it would have been obliged to do before *In re IPO*—that there is some evidence of a shared experience of discrimination among IBC's African–American employees. In every case plaintiffs cite for the proposition that the court should not peer too deeply into statistical methodology or findings at the certification stage, they run up against the same problem: in all of those cases, the plaintiffs were able to provide evidence of a significant statistical disparity in the employment data. For example, in

the actual rate of African–American promotions and the expected rate of African–American promotions, right?
A. Right. Or alternatively, the racial difference in promotions is not statistically significant at conventional test levels, yes.
* * *
Q. So your conclusion is that your statistical analysis as set forth on Tables 5 and 6 represents that there is not a statistically significant difference between the promotion rates of African–Americans and the promotion rates of non

African–Americans on Table 5 and whites on Table 6?
A. Right.
Q. Okay?
A. Or whites versus African–American in Table 6. They're *two separate comparisons.*
(Killingsworth Dep., attached as Ex. 6 to Def.'s Mem., at 214, 217; *see also* Tr. at 12 (plaintiffs' counsel stating, "I'm certain that you will hear from counsel that there is no statistical analysis with respect to [promotions], and that's quite correct. . . ."))

both *Hnot II* and *Velez v. Novartis Pharms. Corp.,* the court held that the certification stage was not the proper arena for engaging in an exhaustive fact-finding mission through the wilds of statistical mathematics. *See Velez v. Novartis Pharms. Corp.,* 244 F.R.D. 243, 261 (S.D.N.Y.2007); *Hnot II,* 241 F.R.D. at 209–10. However, in both cases, the plaintiffs' expert had found disparities in the personnel data that reflected between 3.39 and 6.4 standard deviations. *Velez,* 244 F.R.D. at 263; *Hnot I,* 228 F.R.D. at 483. Here, by contrast, plaintiffs' expert opines only that the disparity in promotions for the relevant period was "within 0.02 of being statistically significant." (Killingsworth Decl. ¶ 15.) This court need not make any credibility determinations concerning the parties' experts' statistical findings in order to conclude that plaintiffs have failed to meet their burden.

Plaintiffs also argue that the anecdotal evidence of promotion disparities between races should satisfy the commonality requirement. (*See* Tr. at 27.) They have submitted the anecdotes of the eleven named plaintiffs who state that they believe they were passed over for promotions in favor of less-qualified or less-experienced white employees, demoted, transferred, given undesirable work assignments, or discouraged from seeking promotions because of their race. Each of those anecdotes may well support an individual claim of race discrimination, but taken together, eleven out of 140 prospective class members is not a sufficiently large sample to show that discrimination in personnel decisions "was the company's standard operating procedure—the regular rather than the unusual practice." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *see also Velez,*

244 F.R.D. at 265–66 (explaining that "[w]hen statistical evidence does not exist ... anecdotal evidence can suffice [to satisfy the commonality and typicality elements] if 'plaintiffs ... compile sworn statements from a large enough sample of plaintiffs to demonstrate that common issues exist' ") (quoting *Cokely v. N.Y. Convention Ctr. Operating Corp.,* No. 00 Civ. 4637, 2003 WL 1751738, at *3 (S.D.N.Y. Apr.2, 2003)). In fact, although plaintiffs assert that "[t]he record is replete with examples of IBC's refusing to promote named plaintiffs and putative class members to managerial positions, and instead promoting less experienced, less qualified Caucasian individuals to these positions," (Pls.' Reply Mem. at 20), they identify only twelve African–American employees (the eleven named plaintiffs and former named plaintiff Lori Gaston) who allegedly were denied promotions in favor of less-experienced or less-qualified white employees since 1994. (*See* Pls.' First Resp. at 24–37; Williams Resp. at 9–11; Cooper Resp. at 10–12.)[25] At least one of the named plaintiffs, James Cooper, acknowledged that he never requested or expressed interest in a promotion. (*See* Cooper Dep., attached as Ex. 10 to Def.'s Mem., at 193.)

Although there is "no minimum number of statements that must be compiled in relation to the total number of similarly-situated employees," *Velez,* 244 F.R.D. at 266, the anecdotal evidence must be detailed, persuasive, and must " 'by itself support an inference' " of pervasive and systemic discrimination, *id.* at 266–67 (quoting *Carter v. Newsday, Inc.,* 528 F.Supp. 1187, 1197 (E.D.N.Y.1981)). Here, the anecdotal statements and testimony concerning discriminatory personnel actions are vague and conclusory, or support,

25. Plaintiffs claim to identify more than 50 individual instances in which African–American employees were allegedly denied promotions in favor of less-experienced or less-qualified white employees. (*See* Pls.' First Resp. at 23–37; Williams Resp. at 9–11; Cooper Resp. at 10–12) Six of those alleged instances involved named plaintiff James Boyd, eight involved named plaintiff Sandra Harris, ten involved named plaintiff Oscar Turner, and nine involved named plaintiff Letitia Fennel Brown. (*See* Pls.' First Resp. at 23–37.) Moreover, the alleged instances tend to center around a few specific promotions or assignments of white employees. For exam-

ple, eight African–American employees complain about the 2000 promotion of Matt Mauro, each claiming that he or she was more experienced or more qualified than Mauro for the position. (*See id.* at 27, 29, 31–32, 34, 35, 36; Cooper Resp. at 10.) The same eight employees also complain about the 1999 hiring of Kevin Donovan into the position of Sales Supervisor formerly held by named plaintiff Andre Shanks. (*See* Pls.' First Resp. at 28, 30, 32, 34, 35, 37; Cooper Resp. at 10.) Obviously, no more than one of those African–American employees could have been selected for either position.

at most, individual claims of discrimination. *See Bacon v. Honda of Am. Mfg. Co.*, 370 F.3d 565, 571 (6th Cir.2002) ("Conclusory allegations and general assertions of discrimination are not sufficient to establish commonality"). For example, named plaintiff James Boyd testified in his deposition that he believed IBC discriminated against him when it promoted a white employee named Chris Moccia to the position of Area Sales Manager. (J. Boyd Reply Dep., attached as Ex. A to the Stulberg Reply Decl., at 48.) James Boyd stated that he believed Moccia had "limited tenure" with the company and a "lack of experience," but he did not know which depot Moccia had worked in prior to his promotion; nor did James Boyd explain in any detail why he believed he was more qualified than Moccia for the position.[26] (*Id.* at 49–50.) Likewise, Sandra Harris testified that she did not believe Kevin Donovan, a white supervisor, was qualified for his position, but she did not know whether Donovan had any prior supervisory experience with another employer. (Deposition of Sandra Harris, dated Dec. 18, 2001 ("Harris Reply Dep."), attached as Ex. D to the Stulberg Reply Decl., at 138–39.) In addition, both James Boyd and Sandra Harris testified that they heard supervisor Bob Longo discouraging named plaintiff Oscar Turner from applying for a supervisor position. (*See* J. Boyd Dep., attached as Ex. D to the Stulberg Decl., at 27–28; Harris Dep., attached as Ex. G to the Stulberg Decl., at 439–40.) Yet, Sandra Harris was selected for that particular supervisor position. (Harris Dep., attached as Ex. G to the Stulberg Decl., at 441, 443.) In short, the named plaintiffs provide little other than their subjective impressions to support their claims of systemic discrimination in personnel decisions. *See Harris*, 2007 WL 703868, at *5 (post-*In re IPO* case finding that four "self-serving" affidavits, which contained "little in the way of factual

evidence," were "insufficient to bridge the wide gap between Plaintiffs' own allegations that they were subjected to discrimination and the existence of a class of black employees who have suffered the same alleged injury as Plaintiffs").[27]

Plaintiffs also submit three statements from aggrieved individuals other than the named plaintiffs: former employees Eugene Mills and Todd Randall,[28] and former named plaintiff Lori Gaston. In their strikingly similar affidavits, Eugene Mills and Todd Randall do not state that they applied for or requested promotions during the class period, but only that IBC "constructively ... discouraged and dissuaded [them] from seeking and/or holding a managerial position by the way it disparately treated the few African–American managerial employees employed at the company." (Affidavit of Eugene Mills, sworn to Dec. 5, 2002, attached as Ex. KK to the Stulberg Decl., ¶¶ 4, 6; Affidavit of Todd Randall, sworn to Apr. 24, 2001, attached as Ex. LL to the Stulberg Decl., ¶¶ 4, 6.) These few statements do little to bolster the named plaintiffs' allegations of widespread discrimination in personnel decisions. *See Sheehan v. Purolator*, 839 F.2d 99, 103 (2d Cir.1988) (upholding denial of class certification in sex discrimination case where plaintiffs' statistics failed to withstand scrutiny and plaintiffs submitted an affidavit from only one aggrieved employee other than the named plaintiffs).

In fact, IBC began posting job openings in 2001, and in August 2002 it implemented a comprehensive promotion policy. (*See* Corrente Decl. ¶ 14, Ex. B.) According to IBC's Human Resources Manager for the Jamaica Bakery, from August 2002 to December 2005, IBC posted four front-line supervisor positions in the relevant area. (*Id.* ¶ 14.) No African–American employees applied for or

---

**26.** In their Responses and Objections to defendant's First Set of Interrogatories, plaintiffs state that Moccia had worked at IBC for approximately five years, whereas James Boyd had twenty-three years of seniority at IBC at the time. (*See* Pls.' First Resp. at 25–26.) Plaintiffs do not state whether Moccia had prior work experience with another company; nor do they identify any qualifications other than seniority that might be relevant to a promotion decision.

**27.** Of course, this Report and Recommendation takes no position on the merits of plaintiffs' individual claims, which are not at issue in the instant motion, but conducts this analysis for the sole purpose of evaluating whether the named plaintiffs have met their burden of demonstrating common questions of law or fact.

**28.** Eugene Mills left IBC in September 2002, and Todd Randall left in June 1999.

expressed interest in any of those supervisor positions.[29] (*Id.*) This clearly undermines plaintiffs' claims of ongoing, pervasive discrimination in promotions.

In sum, plaintiffs have not shown commonality with respect to their claims of discriminatory personnel decisions.

### (b) *Commonality of Racial Harassment Claims*

Plaintiffs argue that the aggregate of the named class members' anecdotes of racially motivated harassment presents a common issue of law and fact for all of the putative class members. (Pls.' Mem. at 18; *see also* Compl. ¶ 38.) Defendant counters that plaintiffs are "grossly misstat[ing] and exaggerat[ing]" their racial harassment claims. (Def.'s Mem. at 49.) It maintains that the alleged discrimination was not pervasive, was concentrated in very few depots, and was limited to a very small number of instances. (*Id.* at 49–56.) Defendant further contends that the harassment claims raise myriad individualized questions of fact. (*Id.* at 25; Def.'s Supplemental Memorandum in Opposition to Pls.' Motion for Class Certification, filed Jan. 25, 2008, at 2–3.)

As defendant points out, the putative class members have worked at thirty [30] separate depots (eighteen in New York, eleven in New Jersey, and one in Pennsylvania). (Def.'s Mem. at 6.) The named plaintiffs have worked at only thirteen, or fewer than half, of those depots since 1994 (*see* Plaintiffs' Responses and Objections to Defendant's

Fourth Interrogatories to Class Representative Plaintiffs ("Fourth Class Resp."), attached as Ex. JJ to the Stulberg Decl., at 43–56 (outlining the employment history of each named plaintiff); Pls.' Reply Mem. at 6 n. 5.), and they present evidence of incidents of racially offensive conduct at only twelve depots at most.[31] (*See* Pls.' Reply Mem. at 6–7 (listing depots); Pls.' Supp. Mem. at 3.) Plaintiffs make no attempt to explain how they could prove their hostile environment claims on a class-wide basis given the lack of evidence of any racial harassment in at least sixteen out of thirty depots. Moreover, although plaintiffs present anecdotes of numerous incidents in which white supervisors engaged in or tolerated racially offensive behavior in the workplace, those anecdotes tend to focus on a few specific supervisors in a few specific depots, namely Bob Longo in the Hicksville, Bathgate, and Greenpoint depots; Mike Realmutto in the Woodside depot; and Bob Dieterich in the Greenpoint depot.

Unlike the plaintiffs in *Wright v. Stern*, No. 01 Civ. 4437, 2003 WL 21543539, at *6 (S.D.N.Y. July 9, 2003), whose hostile environment allegations "sufficiently target[ed] centralized personnel to support a finding of commonality" throughout the entire municipal department at issue, named plaintiffs in this case do not provide evidence that African–American employees were subjected to a hostile work environment in all, or even a majority, of depots in the "Metro New York" region.[32] Nor do the named plaintiffs pres-

---

**29.** According to the Human Resources Manager for the Jamaica bakery, IBC generally has difficulty getting Route Sales Representatives to apply for promotions to supervisory positions. (Corrente Decl. ¶ 14.) This is allegedly because front-line supervisors tend to have longer hours and greater responsibility, and they lose the job security and benefits that come with union membership. (*Id.*) Supervisors can also have a lower pay level, since unlike Route Sales Representatives, they do not earn commissions. (*Id.*) In his deposition, named plaintiff Linwood Williams agreed that supervisor positions are not attractive to many Route Sales Representatives because the hours are longer and the job is often more difficult. (Williams Reply Dep., attached as Ex. B to the Stulberg Reply Decl., at 365–66.)

**30.** This number includes the Neptune and Asbury Park depots, which were transferred to the control of IBC's Philadelphia, PA bakery in January

1999. (Forbes Dep., attached as Ex. S to the Stulberg Decl., at 50.)

**31.** Defendant disputes this number, arguing that plaintiffs present admissible evidence of racially offensive conduct at only seven depots. (*See* Def.'s Supplemental Memorandum in Opposition to Pls.' Motion for Class Certification, filed Jan. 25, 2008, at 4–5.) This dispute need not be resolved here. For the reasons explained *infra*, the named plaintiffs cannot meet their burden of establishing commonality even assuming they could prove that putative class members experienced racial harassment at twelve depots.

**32.** *Latino Officers Ass'n v. City of New York*, 209 F.R.D. 79 (S.D.N.Y.2002), is similarly distinguishable. In that case, the named plaintiffs presented evidence that racist slurs and graffiti permeated the entire NYPD. *Id.* at 81.

ent evidence that IBC lacked company-wide policies prohibiting racial harassment, or subjected the proposed class to a general practice of failing to respond adequately to harassment complaints. *See, e.g., Warnell v. Ford Motor Co.*, 189 F.R.D. 383, 390 (N.D.Ill. 1999) (granting class certification where plaintiffs alleged that defendant company's sexual harassment policies and procedures were inadequate, and that the company had a pattern of failing to enforce rules that existed, in the context of a centralized personnel system), *overruled on other grounds, Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577 (7th Cir.2000).

In fact, courts have denied class certification for harassment claims in similar situations, where the putative class members worked in disparate facilities with different supervisors. *See, e.g., Carlson v. C.H. Robinson Worldwide, Inc.*, No. 02–Civ–3780, 2005 WL 758602, at *13 (D.Minn. Mar.31, 2005) (named plaintiffs failed to meet their burden to establish commonality with respect to sexual harassment claims where anecdotal evidence did not demonstrate the existence of a centralized policy and practice of tolerating or promoting sexual harassment, and the question of whether class members in "de-

centralized and independent" branches were subjected to severe and pervasive harassment was not "subject to common proof"); *Faulk v. Home Oil Co.*, 184 F.R.D. 645, 659 (M.D.Ala.1999) (class certification held improper as to hostile environment claims because purported class members worked in twenty-one separate facilities and had "different work environments," and their claims were dependent on the comments and actions of individual managers and therefore were "not subject to generalized proof"); *Levels v. Akzo Nobel Salt, Inc.*, 178 F.R.D. 171, 177 (N.D.Ohio 1998) (denying class certification where employees claiming hostile work environment worked under "separate conditions" and therefore had "little commonality of experience").

In addition, on May 19, 2003, this court so-ordered a stipulation setting out a procedure for complaints of racially offensive conduct, harassment, discrimination, or retaliation.[33] Since that date, there have been no complaints of racially offensive conduct or harassment in the workplace.[34] (*See* Def.'s Mem. at 44: Tr. at 42.) This certainly belies any claims of ongoing racially motivated harassment at any IBC depot.

---

**33.** The order states, in pertinent part:

If any Plaintiff in the future encounters or learns of what the Plaintiff believes is or may be an occurrence of racially offensive conduct, harassment, discrimination, or retaliation (whether directed at him or her or someone else), the Plaintiff through his or her counsel shall make a written complaint to Defendant within five business days following the later of: (a) the date of the occurrence; or (b) the date the Plaintiff learned of the occurrence....Plaintiffs will provide all information available to them at the time they make their complaint. Plaintiffs shall not be required to provide the same information in a separate supplemental interrogatory answer; however, both parties may conduct discovery related to the information provided by the Plaintiffs. Any alleged racially offensive conduct, harassment, discrimination or retaliation which occurs after the date of this stipulation and is not reported under this procedure within five business-days of becoming known to a plaintiff shall not be admissible as evidence in the pending lawsuit unless good cause is shown for the failure to so report.

(*See* Order, dated May 19, 2003.) This so-ordered stipulation arose out of the named plaintiffs' request for permission to file a preliminary injunction motion to enjoin defendant from retal-

iating against plaintiffs for participating in this lawsuit. (*See* Pls.' Reply Mem. at 66; Tr. at 4.)

**34.** In their Reply brief, plaintiffs dispute this assertion, maintaining that they "have submitted complaints to IBC complaining of racial harassment and disparate treatment since the May 2003 Stipulation was entered." (Pls.' Reply Mem. at 35.) However, they submit no evidence of any such complaints. According to IBC, there have been three complaints since May 2003, none involving racial harassment: (1) in September 2005, named plaintiff William Bassett complained about the handling of a worker compensation claim; (2) in April 2006, named plaintiff Andre Shanks complained about "an attendance related letter to his home and absence call in requirements applied to him"; and (3) in July 2007, named plaintiff Sandra Harris complained about the calculation of her commission after a transfer to a different depot. (Defs.' Mem. at 44.) At oral argument, plaintiffs' counsel argued that these three complaints concern alleged retaliation against named plaintiffs Bassett, Shanks, and Harris for participating in the instant case. (*See* Tr. at 94.) However, even accepting that assertion as true, the complaints do not accuse anyone at IBC of engaging in racially motivated harassment.

In sum, plaintiffs' anecdotes of racial harassment are limited as to time and place and do not establish a class-wide impact sufficient to satisfy Rule 23's commonality element. I therefore recommend that plaintiffs' motion be denied. Because plaintiffs have failed to meet their burden of establishing commonality under Rule 23(a), it is unnecessary to analyze the remaining Rule 23 requirements.

### CONCLUSION

For the reasons stated above, I respectfully recommend that plaintiffs' motion for class certification be denied. Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Mauskopf and to my chambers, within ten (10) business days. Failure to file objections within the specified time waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1).

Feb. 5, 2009.